IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| LAURA LEE RUSSELL, | |
| Plaintiff, | **8:16CV481** |
| vs. | |
| NANCY A. BERRYHILL, Commissioner of Social Security;[1] | **MEMORANDUM AND ORDER** |
| Defendant. | |

Plaintiff, Laura Lee Russell ("Russell"), seeks review of the decision by the defendant, Nancy A. Berryhill, Commissioner of the Social Security Administration (the "Commissioner"), denying her application for Supplemental Security Income ("SSI") disability benefits under Title XVI of the Social Security Act. See 42 U.S.C. § 1381. For the reasons explained below, the Commissioner's decision will be affirmed.

## PROCEDURAL BACKGROUND

On July 25, 2013, Russell filed an application for SSI, alleging disability beginning July 13, 2013.[2] (Tr. 16). Russell's claimed disabilities include mental health disorders of bipolar disorder and post-traumatic stress disorder. (Tr. 21-22). Russell's application was initially denied on October 9, 2013, and upon reconsideration on January 15, 2014. (Tr. 16).

On March 12, 2014, Russell requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 16). After requesting a continuance to obtain counsel, the administrative hearing was held before the ALJ on August 6, 2015. (Tr. 16). Russell was represented by new counsel at the hearing. (TR. 35). Following the hearing, the ALJ issued an unfavorable decision on September 1, 2015. (Tr. 26).

The Appeals Council denied Russell's Request for Review of the ALJ's decision. (Tr. 1). Russell has now filed this action to set aside the Commissioner's decision. (Filing No. 1).

---

1 Nancy A. Berryhill replaced Carolyn W. Colvin as Acting Commissioner of Social Security. Pursuant to Fed. R. Civ. P. 25(d) and 42 U.S.C.A. § 405(g), Nancy Berryhill is automatically substituted as a party.

2 Russell has filed four previous applications for disability benefits, all of which have been denied and are final. (Tr. 75, 98).

## FACTUAL SUMMARY

Russell was 49 years old on the date she filed this application, and 51 years old as of the date the ALJ issued the decision.  (Tr. 21, 31).  Russell is a high school graduate and graduated from cooking school with B average grades.  (Tr. 50, 52).  Russell has never been married and has three adult daughters.  At the time of the ALJ hearing, Russell was living at the Siena Francis House shelter.  Russell has never had a driver's license and uses the public bus for transportation.  (Tr. 51).

Russell's last job was working at a Taco John's restaurant in March 2010 for four months.  (Tr. 53).  She stated she left that job because she "can't be around people long enough."  (Tr. 55).  Russell testified her longest employment was approximately seven months working as an inventory specialist at Williams International in 2008-2009, but left her position after the company moved locations.  (Tr. 53-55).  Russell has very limited employment history, which she attributes to raising her children and due to being burned as a child over approximately 80% of her body.  (Tr. 51-55, 256-261).  Russell alleges she has been disabled since July 2013 and believes she is unable to work due to her depression, lack of energy and motivation, feelings of worthlessness, frustration, rapid mood swings, anxiety, lashing out, difficulty sleeping and concentrating, being fidgety, tendency to isolate, and her short attention span.  (Tr. 21, 58-59).

Russell has a documented history of drug use, but testified that she has not used crack cocaine or marijuana since April 8, 2013, and attends sober meetings at the Siena Francis House.  (Tr. 63).[3]  Russell had no physical conditions producing current limitations, although she is a hemophiliac and has scars from burns over 80% of her body.  In 2005, she was diagnosed with idiopathic thrombocytopenic purpura, but she did not undergo any treatment for this condition during the relevant time period, and there was no documentation of current complications.  (Tr. 19, 88).  Her physical exams were generally within normal limits.  (Tr. 19).

## MEDICAL EVIDENCE AND OPINIONS

Russell first was seen by Thomas Weis, PA, ("Weis") at Charles Drew Health Center on July 17, 2013, upon the request of her caseworker at the shelter.  Russell was living at the Lydia House

---

[3] However, the ALJ found that Russell downplayed the extent of her substance abuse.  (Tr. 21).

homeless shelter at this time.  Russell reported to Weis that she had been feeling sad, down, and depressed for several years. She reported increased problems with sleeping for the prior three months and was irritable and could not focus.  (Tr. 463).  Russell was started on Wellbutrin and Trazadone, and an appointment to see a behavioral health councilor was set up.  (Tr. 465).  On July 23, 2013, Russell returned for a follow up for her difficulty sleeping, agitation, and irritability. She reported that Trazadone was not helping and was prescribed Risperidone for agitation. Regular appointments with Mary Manning, behavioral therapist, ("Manning") were set up.  (Tr. 460-462).

Russell had another follow up appointment at Charles Drew with Manning on August 2, 2013, and had a brighter mood and more positive outlook.  It was noted Russell was doing volunteer work at the front desk several mornings, and was assertive in her communication with her concerns with staff and other guests.  Russell was assessed a Global Assessment of Functioning (GAF) score of 45-50.  (Tr. 457-58).  On August 9, 2013, Russell returned to Charles Drew for a follow up with Manning.  Russell had "increase[d] mood and positive attitude." She was reported as "[d]oing well in CD program and gaining progress.  Cooperating with staff and interacting well with program[m]ers."  It was also noted that Russell was volunteering to do chores and ministry at the Lydia House.  (Tr. 447).  The psychiatric notes provide that Russell's affect, psychomotor activity, grooming, and dress were all normal, and that her mood was cheerful.  At this time, Manning assessed Russell's GAF at 62-67.  (Tr. 448).

On August 12, 2013, Russell was referred to Dr. Nathan Bruce, DO, at Community Alliance as part of a Homeless Services Program ("Homeless Services Program") Psychiatric Intake Assessment.  Dr. Bruce performed a psychiatric evaluation and medication management for Russell's bipolar disorder and anxiety. Russell reported that she was diagnosed as bipolar in 2000. She felt her symptoms were not well controlled and she had frequent labile moods, problems with sleep, feelings of hopeless and helplessness, depression, decreased energy, and concentration.  She reported she was proud that she was on her way to sobriety.  Russell also felt she may suffer from PTSD as a result of domestic violence she suffered between ages 20 and 40.  Dr. Bruce observed Russell's speech "[wa]s very pressured and she reports labile mood at this time" and she was slightly psychomotor agitated.  Dr. Bruce assessed Russell's GAF at 50.  Russell complained of more depressed moods, but reported she had distinct episodes of either hypomanic or manic episodes.  Dr. Bruce observed Russell appeared slightly paranoid at times, although she denied

symptoms of delusions. Dr. Bruce increased her dosage of Risperdal and Trazodone, and started her on Atarax for anxiety. (Tr. 435-438).

On August 16, 2013, Russell was seen by Weis at Charles Drew for urinary incontinence. Depression was noted as a chronic problem, however, at this time it was noted that she was negative for anxiety, depression and insomnia, and had a normal affect, speech, and psychomotor activity. (Tr. 499-501).

On September 9, 2013, Russell completed a Daily Activities and Symptoms Report. She indicated she was living in a shelter, her ability to tend to her personal needs such as bathing and dressing "depend[s]" on if her "illness get[s] in the way," can cook "mostly everything," can clean her room, do yard work, visits "friend" and plays cards, can exercise, and can go to the store, church, and health appointments, and sleeps 4-5 hours a night. (Tr. 279-280). She reported having mood swings often, which is caused by people, loneliness, and fear, is worsened when she is "under pressure," and experiences the symptoms "mostly all the time." She also reported she stopped running and exercising because it made her depressed. (Tr. 281-282).

On September 17, 2013, Russell reported to Dr. Bruce she had been in a bad "mood" for a couple of weeks. She reported low energy and motivation. She reported feeling fatigue during the day and had continuous racing thoughts. She felt like isolating but staff at the shelter would not let her. Dr. Bruce started Russell on Prazosin and increased her Risperdal dosage. (Tr. 483).

On September 30, 2013, Debra Pflager, BSW, SOAR Project Benefits Specialist, ("Pflager") opined that Russell "is unable to seek and maintain employment due to her mental and physical health symptoms of Bipolar Affective Disorder, PTSD, Idiopathic Thrombocytopenic Purpura and Severe Body Scarring. Despite maintaining a consistent medication regiment, she continues to experience significant health impairments." (Tr. 469-473).

On October 4, 2013, Lee Branham, PhD, ("Dr. Branham") examined the record for the state agency. On October 9, 2013, the state agency found Russell was not disabled. (Tr. 87-95). Dr. Branham noted Russell only recently started treatment after not requiring any for the previous ten years. Dr. Branham suggested that Russell's limitations were only at a moderate level. Dr. Branham considered Russell's conditions of thrombocytopenia and burns, and found there was no indication of more than mild physical limitations as a result of those conditions. Dr. Branham opined that Russell had severe affective disorders, anxiety disorders, and substance addiction

disorders, but only had mild restriction of activities of daily living and difficulties in maintaining concentration, persistence, or pace, and moderate difficulties in social functioning.

The state agency found Russell was not significantly limited in her abilities to carry out very short and simple instructions, to maintain attention and concentration for extended period, sustain an ordinary routine without supervision, make work related decisions, or the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. Russell was "moderately" limited in the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. (Tr. 90-91). The agency also determined that Russell's social anxiety leads to moderate limitations in dealing effectively with the public and with supervisors. (Tr. 91-92).

On October 15, 2013, (approximately one week after the initial denial of her application), Russell reported to Dr. Bruce that she feeling depressed and hopeless. She reported having low concentration, appetite, and energy, and was experiencing nightmares and avoidance behaviors. She had anxiety but attributed it to living at the Open Door Mission. Dr. Bruce assessed her GAF at a 47. Dr. Bruce continued Russell's previous medications, increased her dosage of Prazosin, and started her on Wellbutrin. (Tr. 482).

On November 18, 2013, Russell reported to Dr. Bruce that she had continued depression, low energy and appetite, and nightmares. She was attending groups but had a desire to isolate. She felt like her anxiety was worse. She reported auditory hallucinations of a voice telling her to "give up." Dr. Bruce assessed her GAF at 47, and increased her dosage of Risperdal and Wellbutrin. (Tr. 481).

On December 2, 2013, Dr. Bruce completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental) form. According to Dr. Bruce's Medical Source Statement, Russell's mental illness caused "marked" limitations in understanding and remembering complex instructions, the ability to carry out complex instructions, and "extreme" limitations with respect to the ability to make judgments on complex work-related decisions. Dr. Bruce also noted that Russell had "marked" limitations of her ability to interact appropriately with supervisors and to respond to usual work situations and changes in a routine work setting, "moderate" limitation on interacting with co-workers, and "mild" limitation in interacting appropriately with the public. Dr.

Bruce did not believe Russell had any limitations with respect to understanding, remembering, and carrying out simple instructions.   (Tr. 475-477).

On December 16, 2013, notes from the Community Alliance clinic noted Russell reported to Dr. Bruce that her mood was stable but a little low.   Russell also was sleeping better, but she felt sedated in the morning after taking her medication. Russell reported her anxiety was improved but still had nightmares.   Dr. Bruce assessed her GAF at 47.   Dr. Bruce continued Russell on her medications and decreased her Atarax dosage.   (Tr. 480).

On January 12, 2014, Pflager authored another letter opining that, "[i]n consideration of the severity of [Russell's]mental and physical health symptoms, as well as her deficient daily living skills, impaired social functioning and inability to maintain concentration, [Russell] is unable to sustain substantial gainful employment."   (Tr. 490-491).

On January 14, 2014, Glenda Cottam, PhD, JD, ("Dr. Cottam") examined the record at the reconsideration level for the state agency. Dr. Cottam reviewed all MER and considered mental listings, in particular, 12.04 and 12.06.   Dr. Cottam concluded substance abuse was not problematic at the time, as Russel had been sober from crack cocaine for about one year.   Dr. Cottam found that Russell is "intelligent - having earned an associate's degree," memory problems were not indicated, she "doesn't appear to have a problem with attention," and can understand/remember/carry out short and simple instructions necessary for cooking and cleaning.   Dr. Cottam reviewed Dr. Bruce's Medical Source Statement and opined that "His opinions do not seem completely consistent with the other MER."   Dr. Cottam noted Russell can tolerate groups and church, she reports she visits with friends, and health care professionals do not report any bizarre behavior.   Dr. Cottam noted that Russell has been able to adjust to some changes, including being sober, being in the Open Door Mission, being in treatment at the Lydia House, etc., though she might have "some mild to moderate challenges at times."   The conclusion was that Russell had "no severe conditions that would preclude working."   (Tr. 97-104).   Dr. Cottam concluded Russell was "moderately limited" in the ability to accept instructions and respond appropriately to criticism from supervisor and her ability to interact appropriately with the general public, as "her social anxiety leads to moderate limitations in dealing effectively with the public and with supervisors."   Dr. Cottam also opined Russell was moderately limited by her stress tolerance in adapting to changes in work environment and in independent planning, financial, and other areas.   (Tr. 109).

On January 21, 2014, Russell saw Dr. Bruce at Community Alliance and reported that she continued to struggle with depression, anxiety, and a lack of energy at times. Her biggest complaints were increased anxiety and depression. She had racing thoughts of hopelessness. She denied symptoms of delusions. Dr. Bruce assessed her GAF at 47. He continued her medications of Risperdal, Trazadone, Atarax, Prazosin, and directed her to take Wellbutrin for two weeks before switching to Prozac. (Tr. 566).

Russell saw Dr. Bruce again on March 31, 2014, reporting continued depression. She was sleeping better but continued to have nightmares. Dr. Bruce noted she was anhedonic and experiencing hopelessness. She continued to have anxiety but denied racing thoughts. She had PTSD symptoms, including nightmares. Dr. Bruce assessed her GAF as 47, and increased her Prozac dosage. (Tr. 565).

Russell saw Dr. Bruce again on April 28, 2014. She reported she was depressed the previous week, but it had improved the current week and was able to enjoy things. She also reported improved anxiety, better sleep, and decreased nightmares. (Tr. 564). Dr. Bruce noted she was overall stable. Her GAF on this date is not legible. She continued taking Risperdal, Trazadone, Atarax, Prazosin, and an increased dosage of Prozac. (Tr. 564).

On August 20, 2014, Russell was discharged from the Homeless Services Program with the agreement of Dr. Bruce. The discharge notes Russell "[o]btained mental health services, and got stabilized with her symptoms." (Tr. 558).

Subsequent to her discharge from the Homeless Services Program, there is a large gap in Russell's treatment. On April 9, 2015, Russell was seen at Charles Drew with "no current health concerns." The notes state that Russell would "restart[]" psychiatry care with Dr. Bruce at Community Alliance in the near future." Russell requested trazadone for her insomnia. (Tr. 495).

On July 9, 2015, Russell was referred to the Douglas County Community Mental Health Center by SOAR and the CA-Homeless Clinic, for her depression, mood swings, and impaired sleep. (Tr. 543). Dan Brune, APRN, ("Brune") evaluated Russell. Russell reported intense mood swings, crying spells, and worthlessness that had worsened the last three to four months. She reported being clean from cocaine for two years. She was described as psychomotor agitated, alert, fidgety in the chair, appeared older than her stated age, appropriately dressed and groomed, but appeared to be a poor historian. She was hyperverbal and difficult to redirect at times. Brune noted Russell's mood and affect were irritable, frustrated, angered, miserable, labile, and agitated.

7

Her attention was impaired, difficult to focus, and easily distracted. She had concrete abstraction, normal fund of knowledge, normal language, and an estimated average IQ. Russell described she was at the "manic" level of her illness, which she stated had "been as bad as 8/10." Brune noted that Russell had adequate impulse control, but endorsed passive adverse ideations, remained homeless at the Siena Francis house, had impaired sleep, and remained agitated and restless throughout the consult. Brune assessed Russell's GAF at 46. (Tr. 543-551). Urine was also collected from Russell on this date for chemical testing. She tested negative for all illicit substances (including cocaine), but tested positive for cannabinoids. (Tr. 552-553).

On July 31, 2015, Russell followed up with Brune at the Douglas County Community Mental Health Center. Russell reported worse depression every day, increasing isolation, and that she stays in her room at the homeless shelter. She reported sleeping two to three hours at the most, and had racing thoughts and nightmares. Russell did report that Seroquel helps "level" her out. Russell reported worse mood swings, crying, lashing out, was irritable and easily frustrated, and stated she would be better off dead. Russell appeared disheveled with appropriate dress, maintained fair eye contact, was psychomotor restless and fidgety, but was cooperative. She was oriented, had good speech and normal thought process, but seemed to be easily distracted and forgetful. She appeared to have some paranoia but did not appear in imminent danger to herself or others. Brune assessed her GAF at 46-47. He recommended increasing Seroquel and Abilify dosages, added Celexa, added Mirtazapine for depression and insomnia, and recommended she begin CBT for sobriety and coping with anxiety. (Tr. 567-570).

On July 31, 2015, Brune completed a Mental Impairment Questionnaire.[4] He assessed Russell as suffering from severe psychosis and rated her severe on Axis IV. Brune assessed her GAF at 46 and her highest GAF from the year at 46. He noted her numerous psychotic medication changes and adjustments resulted in limited control of her depressive and psychotic symptoms. Brune observed that Russell remained psychomotor agitated, restless, had poor eye contact, was easily distracted, impaired concentration, mood swings, had labile moods from tears to anger, and was easily frustrated and overwhelmed. His prognosis was "poor-guarded." Brune opined that Russell was unable to meet competitive standards or had no useful ability to function in 15 of the 16

---

[4] In Russell's brief, she notes that Brune's Questionnaire was signed off by Brune's supervising psychiatrist, Dr. Marin Broucek, and cites to page 577 of the record. (Filing No. 21 at p. 3). However, the administrative record filed with the Court ends at page 576. Nevertheless, it does appear "Broucek" signed next to Brune's signature line, although there is no verification in the record that this is Brune's supervising psychiatrist.

mental abilities and aptitudes needed to do unskilled work. Brune opined that Russell had an impaired stress balance which exacerbated symptoms of suicidal ideations, mood lability, and impaired sleep at all phases. Brune further opined that Russell had no useful ability to function in any area of mental abilities and aptitudes needed to do particular types of jobs, including no ability to interact appropriately with the general public, maintain socially appropriate behavior, and adhere to basic standards of neatness and cleanliness. Brune assessed Russel with "extreme" functional limitations in the areas of activities of daily living, social functioning, concentration, persistence, or pace, and that she had four or more episodes of decompensation in the last 12-month period, each of at least two weeks duration. Brune opined that Russell's impairments lasted or can be expected to last more than twelve months. Brune concluded that, if Russell only suffered from addictions she probably could be employed, however, "given the additional problems of severe bipolar depression [and] PTSD, I believe she is disabled due to her mental illness [and] unable to be gainfully employed." (Tr. 571-576).

## THE ALJ's DECISION

The ALJ evaluated Russell's claim using the "five-step" sequential analysis prescribed by the Social Security Regulations.[5] See 20 C.F.R. § 404.1520(a)(4). In doing so, the ALJ found that Russell has not engaged in substantial gainful activity since the application date and had severe impairments of bipolar disorder, posttraumatic stress disorder ("PTSD"), and a history of substance

---

5 The Social Security Administration uses a five-step process to determine whether a claimant is disabled:

> At the first step, the claimant must establish that he has not engaged in substantial gainful activity. The second step requires that the claimant prove he has a severe impairment that significantly limits his physical or mental ability to perform basic work activities. If, at the third step, the claimant shows that his impairment meets or equals a presumptively disabling impairment listed in the regulations, the analysis stops and the claimant is automatically found disabled and is entitled to benefits. If the claimant cannot carry this burden, however, step four requires that the claimant prove he lacks the RFC to perform his past relevant work. Finally, if the claimant establishes that he cannot perform his past relevant work, the burden shifts to the Commissioner at the fifth step to prove that there are other jobs in the national economy that the claimant can perform.

Gonzales v. Barnhart, 465 F.3d 890, 894 (8th Cir. 2006)(citing 20 C.F.R. §§ 404.1520(a) and 416.920(a)).

abuse. (Tr. 18). The ALJ found that the above mental impairments cause more than mild limitations in the four broad functional areas, but found that Russell had no severe physical limitations. (Tr. 19). The ALJ found that the above impairments did not meet or medically equal the severity of one of the impairments listed in the regulations. (Tr. 19). The ALJ found that the medical evidence indicates Russell has mild restrictions in activities of daily living, including minor problems performing household chores, maintaining personal hygiene, or performing other activities of daily living. (Tr. 19). The ALJ found that Russell has moderate difficulties in social functioning, and that the medical evidence and the record indicates that Russell has "some" problems interacting with coworkers, the public, and supervisors, and should have no more than occasional social interaction, but that there was no evidence that she had any marked or extreme limitations in social functioning. (Tr. 20). The ALJ determined that the record "supports a conclusion that [Russell] can perform the basic requirements of simple and unskilled work without significant limitation" and that Russell "needs entry-level work that is unskilled and repetitive and does not involve an SVP greater than two." The ALJ found that although Russell has mild to moderate difficulties with concentration, persistence, or pace, there is no evidence she has marked or extreme limitations in those areas, nor has she experienced any episodes of decompensation of an extended duration. (Tr. 20).

The ALJ formulated Russell's residual functional capacity ("RFC")[6] as follows:

> [C]laimant has the [RFC] to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant needs entry-level work that is unskilled and repetitive, svp 1-2. The claimant is limited to social interaction on an occasional basis with coworkers, supervisors and public.

(Tr. 20). In making this RFC determination, the ALJ considered opinion evidence and all of Russell's symptoms and the extent to which those symptoms could reasonably be accepted as consistent with the objective medical evidence. (Tr. 20). The ALJ found that Russell's medically determinable impairments could reasonably be expected to cause some of her alleged symptoms; however, the ALJ found Russell's statements concerning the intensity, persistence and limiting effects of those symptoms not entirely credible. (Tr. 21). Specifically, the ALJ found Russell's

---

[6] "'Residual functional capacity' is 'the most [a claimant] can still do' despite the 'physical and mental limitations that affect what [the claimant] can do in a work setting' and is assessed based on all 'medically determinable impairments,' including those not found to be 'severe.'" *Gonzales*, 465 F.3d at 894 n.3 (quoting 20 C.F.R. §§ 404.1545 and 416.945).

subjective complaints were out of proportion with the objective medical evidence, and that one week after her application for benefits, she sought treatment but "dropped out" on August 12, 2013. (Tr. 24). The ALJ further found Russell's credibility was eroded by gaps in treatment and times when she went on and off medications. The ALJ also took note that Russell sought treatment but stopped "coincidentally" when her disability advocate obtained a checklist from Dr. Nathan Bruce, D.O., shortly after intake at Community Alliance. The ALJ also considered that, "[t]here is no evidence that [Russell] is sober of cocaine and cannabis (as she reports to Dan Bruce, APRN)" and her attendance at nightly AA meetings was not verified. (Tr. 24).

The ALJ additionally found Russell was not credible due to her "vagueness about dates" and the gap in treatment between April 2014 to April 2015, before her admission into Douglas County on July 9, 2015. (Tr. 24, 543). The ALJ also found Russell less than credible because she did not return to her doctors at Community Alliance and "was vague about whether she had refilled medications in over one year." (Tr. 24-25). The ALJ noted that when Russell appeared for the first hearing in April 2015, she acknowledged that she did not return to Dr. Bruce but stated she planned to return to if the hearing was postponed. Russell thereafter did not seek medical treatment until mid-July, two weeks before the rescheduled hearing. The ALJ found Russell had not been compliant with mental health treatment for any period lasting at least twelve months. (Tr. 25).

The ALJ also evaluated the medical source statements and evidence in the record. The ALJ gave "little weight" to Dr. Bruce's opinion as set forth in his December 2, 2013, medical source statement. The ALJ noted that the medical source statement was given after initial contact and start of treatment. The ALJ also noted that by December 16, 2013, Russell reported to Dr. Bruce that her mood was stable and she was sleeping better. The ALJ "agreed with" Dr. Cottam's analysis that little weight should be given to Dr. Bruce's opinions. Finally, the ALJ took note that "claimant never returned to Dr. Bruce." (Tr. 22).

The ALJ gave little weight to the opinion of Ms. Pflagger because she is the advocate who helped Russell apply for benefits, is not an acceptable medical source, and is not a treating source. The ALJ also found Ms. Pflagger's opinion is not consistent with the record as a whole, and lacked specific functional limitations that would last a year. (Tr. 23).

The ALJ gave greater weight to the DDS sources. The ALJ gave "significant weight" to Dr. Cottam's findings that Russell was intelligent, had earned an associate's degree, had no memory problems or problems with attention, could understand, remember, and carry out short and simple

instructions, could tolerate groups and church and visit with friends, and could adjust to mild to moderate changes.   (Tr. 23).

The ALJ gave little weight to APRN Brune's opinion.   The ALJ noted Brune completed the Impairment Questionnaire after only two weeks of treatment.   Russell had only resumed taking her medications after not consistently taking them or undergoing therapy for any period of twelve months.   The ALJ stated "there was no drug testing" and "no attached chemical evaluation intake or treatment notes submitted."   (Tr. 24).

The ALJ found Russell has no past relevant work and thus considered whether she could make a successful adjustment to other work.   (Tr. 25).   The ALJ considered that Russell's ability to perform work at all exertional levels was compromised by nonexertional limitations, and therefore considered the opinion of an impartial vocational expert.   (Tr. 26).   The vocational expert in this case, Stephen Schill, testified that an individual with Russell's age, education, work experience, and RFC would be able to perform the requirements of representative occupations such as laundry worker, medical kit helper, sorter, and cafeteria attendant.   (Tr. 66, 234).

Counsel for Russell examined the vocational expert using the medical source statement by Dr. Bruce and the questionnaire filled out by APRN Brune.   Counsel asked the vocational expert if, assuming the same facts existed in the hypothetical presented by the ALJ, the same individual was unable to interact with her supervisor at least 50% of the time, whether any of the occupations identified by the vocational expert would be ruled out. The vocational expert replied it would eliminate all positions in the national economy.   Counsel additionally asked the vocational expert whether any of the previously identified occupations would be ruled out if the individual was prevented from attending work at least three days of each work month.   The vocational expert testified it would rule out all occupations available in the national economy.   (Tr. 67-68).

Based on the testimony of the vocational expert, and the medical and opinion evidence in the record, the ALJ determined that jobs exist in significant numbers in the national economy that Russell could perform, and, therefore, she was not disabled from July 25, 2013, the date the application was filed.   (Tr. 26).

In this appeal, Russell contends the only step in the evaluation process that is at issue is step five, that is, whether the Commissioner met the burden to prove that there are other jobs in the national economy that the claimant can perform.   (Filing No. 21 at p. 6).   Russell argues the ALJ erroneously determined that Russell has the mental residual functional capacity to make successful

adjustment to work because the ALJ (1) failed to give substantial weight to treating source opinions; (2) improperly evaluated the materiality of Russell's drug dependence; and (3) failed to fairly and fully develop the evidentiary record.   (Filing No. 21).

## ANALYSIS

A reviewing court "will uphold the ALJ's decision to deny benefits if that decision is supported by substantial evidence in the record as a whole." *Perks v. Astrue*, 687 F.3d 1086, 1091 (8th Cir. 2012).   "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007).   In determining whether substantial evidence supports the ALJ's decision, the court considers evidence that both supports and detracts from the ALJ's decision. *Moore v. Astrue*, 623 F.3d 599, 605 (8th Cir. 2010) (internal citation omitted).   The reviewing court "may not reverse simply because [it] would have reached a different conclusion than the ALJ or because substantial evidence supports a contrary conclusion." *Miller v. Colvin*, 784 F.3d 472, 477 (8th Cir. 2015). However, the court's review is "more than a search of the record for evidence supporting the Commissioner's findings, and requires a scrutinizing analysis, not merely a 'rubber stamp'" of the Commissioner's decision.   *Scott ex rel. Scott v. Astrue*, 529 F.3d 818, 821 (8th Cir. 2008) (internal citations omitted).

### I.       Weight Provided to Treating Sources

Russell argues the ALJ improperly afforded "little weight" to the opinion statements provided by treating sources Dr. Bruce and Brune, and afforded "greater weight" to the non-examining sources, without sufficient justification.   (Filing No. 21 at p. 6).

"The ALJ must give 'controlling weight' to a treating physician's opinion if it 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence.'"   *Papesh v. Colvin*, 786 F.3d 1126, 1132 (8th Cir. 2015)(quoting *Wagner v. Astrue*, 499 F.3d 842, 848-49 (8th Cir. 2007)).   "Even if the [treating physician's] opinion is not entitled to controlling weight, it should not ordinarily be disregarded and is entitled to substantial weight."   *Id.* (quoting *Samons v. Astrue*, 497 F.3d 813, 818 (8th Cir. 2007)).   A treating physician's opinion may have "limited weight if it provides conclusory statements only, or is inconsistent with the record."   *Id.*   "When an ALJ discounts a treating

[source's] opinion, he should give good reasons for doing so." *Davidson v. Astrue*, 501 F.3d 987, 990 (8th Cir. 2007); *Jenkins v. Apfel*, 196 F.3d 922, 924-25 (8th Cir. 1999) (stating the ALJ may discount or disregard such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions). An ALJ evaluates a treating sources' opinion in consideration of factors such as length of treatment, frequency of examination, nature and extent of the treatment relationship, support of opinion afforded by medical evidence, consistency of opinion with the record as a whole, and specialization of the treating source. 20 C.F.R. 404.1527(c)(2).

Russell first argues that the ALJ did not provide an adequate basis to give Dr. Bruce's medical source statement "little weight." (Filing No. 21 at p. 7). Dr. Bruce was Russell's only treating physician in the record and thus his opinion should have been given "controlling weight," unless it was not "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." *Papesh*, 786 F.3d at 1132.

The ALJ stated she gave "little weight" to Dr. Bruce's medical source statement authored on December 2, 2013, because it was given "after initial contact and start of treatment" and because "claimant never returned to Dr. Bruce." Further, the ALJ "agree[d]" with the analysis of Dr. Cottam's state agency review at the reconsideration level that "little weight is to be given to this opinion[]." (Tr. 22). The ALJ also appeared to consider that, two weeks after Dr. Bruce completed his medical source statement, on December 16, 2013, Dr. Bruce noted that Russell's mood was stable but low, she was sleeping better at night, and she denied any auditory or visual hallucinations or any thoughts of violence.

The Court agrees with Russell that the ALJ did not provide "good reasons" for providing little weight to Dr. Bruce's medical source statement as the only treating physician in the record. See 20 C.F.R. § 404.1527(d)(2); *Dolph v. Barnhart*, 308 F.3d 876, 878-79 (8th Cir. 2002)("[A]an ALJ should 'give good reasons' for discounting a treating physician's opinion."). First, in more than one place the ALJ makes the factual misstatement that Russell "stopped seeking treatment" and "never returned" to Dr. Bruce after obtaining the medical source statement. (Tr. 22, 24).[7] Substantial evidence in the record does not support this statement, as the record contains Dr. Bruce's

_____

7 The ALJ also states that one week after Russell filed her application for benefits, "she sought treatment but dropped out on August 12, 2013." (Tr. 24). August 12, 2013, was the first date Russell was seen by Dr. Bruce, and as set forth in the Background section, Russell continued to see Dr. Bruce monthly through April 2014.

monthly treatment notes from Russell's visits subsequent to the medical source statement, dated December 16, 2013, January 21, 2014, March 31, 2014, and April 28, 2014.  Additionally, Dr. Bruce's medical source statement was authored four months after Russell first began seeking treatment with him, not after "initial contact," and the record contains Dr. Bruce's treatment notes dated August 12, 2013, September 17, 2013, October 15, 2013, and November 18, 2013.  The ALJ also erroneously indicated that Dr. Bruce authored the medical source statement after Russell's October 15, 2013, visit, omitting that Russell returned to Dr. Bruce in November 2013, when Russell reported continued depression, low energy and appetite, and nightmares, a desire to isolate, and auditory hallucinations that a voice was telling her to "give up."  Therefore, the ALJ's explanation for discounting Dr. Bruce's opinion based on misstatements of Russell's treatment history is not supported by substantial evidence in the record.

The ALJ primarily relied on the state agency review of the record performed by Dr. Cottam at the reconsideration level to determine that Dr. Bruce's opinion regarding Russell's mental limitations should be given "little weight," and gave the non-examining state agency sources "greater weight."  Dr. Cottam, a non-examining and non-treating psychologist, reviewed Dr. Bruce's Medical Source Statement and opined that "His opinions do not seem completely consistent with the other MER."  In particular, Dr. Cottam opined that Russell is intelligent because she earned an associate's degree in culinary skills, no memory problems were indicated, she did not appear to have a problem with attention, she can understand/remember/carry out short, simple instructions, she can tolerate groups and church, she can visit with friends, does not act "bizarre" when seen by health care professionals, and because she has been able to adjust to "some changes" such as being sober, being in the Open Door Mission, being in treatment at the Lydia House, although she might have "mild to moderate challenges at times."

Generally, more weight is given to the medical opinion of an examining source than to the medical opinion of a non-examining medical source.  See 20 C.F.R. § 404.1527(d)(1).  An ALJ may discount or even disregard the opinion of a treating source where other medical assessments are supported by better or more thorough medical evidence.  See *Reed v. Barnhart*, 399 F.3d 917, 921 (8th Cir. 2005).  Dr. Cottam's analysis does not demonstrate that Dr. Bruce's medical source statement was inconsistent with the record or explain why it should be given "little weight," nor is Dr. Cottam's opinion supported by "better or more thorough medical evidence."  For example, Dr. Cottam noted that Russell can tolerate groups and church and visits with friends.  This evidence

came from Russell's self-report dated September 9, 2013, and from Russell's visit with a behavioral therapist at Charles Drew early in August 2013. (Tr. 448, 457-58). Additionally, Dr. Cottam also agreed with some of Dr. Bruce's opinions, as they both opined that Russell does not have any limitations with respect to understanding, remembering, and carrying out simple instructions.

Dr. Bruce's treatment notes from Russell's appointments between August 12, 2013, and the date of his medical source statement are internally consistent. In September 2013, Russell "felt like isolating" but staff at the shelter would not let her (Tr. 483); in October 2013 she was "feeling depressed and hopeless" and was experiencing "avoidance behaviors" (Tr. 482); and by November 2013, she was experiencing depression, low energy and appetite, worsened anxiety, and "was attending groups but had a desire to isolate." (Tr. 481). In December 16, 2013, Russell reported some improvements in her anxiety and that her mood was stable but "low," but when Russell returned to Dr. Bruce in January 2014 and March 2014 and continued to struggle with depression, anxiety, lack of energy at times, racing thoughts, and hopelessness. Dr. Bruce continually assessed Russell's GAF between 47-50 and added/changed/increased Russell's medication dosages until she was stabilized in April 2014.

Nothing cited by Dr. Cottam in her analysis specifically demonstrates an inconsistency in the record with Dr. Bruce's opinion that Russell has marked limitations in her ability to interact appropriately with supervisors (as opposed to Dr. Cottam's assessment of "moderate" limitation), moderate limitations in interacting with co-workers, mild limitations in interacting appropriately with the public, and marked limitations in understanding and carrying out complex instructions. "Absent some explanation for finding an inconsistency where none appears to exist" the Court does not consider Dr. Bruce's opinions in this regard to be examples of "inconsistent opinions that undermine the credibility of such opinions." *Reed*, 399 F.3d at 921. An ALJ may discount or even disregard the opinion of a treating source where other medical assessments are supported by better or more thorough medical evidence. See *id.* But that was not the case here. Dr. Bruce's medical source statement was the only opinion in the record from a treating medical source, and it was entitled to controlling weight, or at least substantial weight, absent inconsistency with the medical evidence of record. See, *Tilley v. Astrue*, 580 F.3d 675, 680-81 (8th Cir. 2009); *Trossauer v. Chater*, 121 F.3d 341, 343-44 (8th Cir. 1997).

However, even had the ALJ given the appropriate weight to Dr. Bruce's opinions with respect to Russell's limitations, it would not materially alter the RFC assessed by the ALJ when

considered with substantial medical evidence in the record as a whole. The ALJ's RFC limited Russell to unskilled, repetitive, entry-level work, and incorporated the restriction that she be "limited to social interaction on an occasional basis with coworkers, supervisors and public." The RFC formulated by the ALJ does not materially differ from the restrictions noted by Dr. Bruce's medical source statement, as it takes into account her limitations with respect to supervisors, coworkers, and the public, and limits her to unskilled entry-level work. Therefore, although the ALJ may not have afforded Dr. Bruce's medical source statement the appropriate weight, it is a difference without distinction because the RFC nevertheless incorporates the limitations noted by Dr. Bruce in his medical source statement.

Russell next challenges the weight that the ALJ gave to APRN Brune's opinion. Russell identifies Brune as a "treating source." As an APRN, Brune was not an acceptable medical source and thus could not qualify as a "treating medical source." See *Sloan v. Astrue*, 499 F.3d 883, 888 (8th Cir. 2007); 20 C.F.R. §§ 404.1502 and 404.1513 (APRNs are acceptable medical sources for claims filed after March 27, 2017). The opinions from "other sources" such as APRNs should be evaluated using the same factors used to evaluate opinions from acceptable medical sources, set forth in 20 C.F.R. § 404.1527(c). See Social Security Ruling 06-03p, 71 Fed. Reg. 45593-03, 2006 WL 2263437 (Aug. 9, 2006); *Shontos v. Barnhart*, 328 F.3d 418, 426 (8th Cir. 2003). The ALJ is not bound by these factors, as the ALJ has greater discretion in dealing with opinions from other sources. *Tindell v. Barnhart*, 444 F.3d 1002, 1005 (8th Cir. 2006).

The ALJ did not abuse its discretion in giving little weight to Brune's opinions in the Mental Impairment Questionnaire. The ALJ noted that Brune authored the opinion based on only two weeks of treatment. Additionally, Russell had not been consistent with taking medications or undergoing therapy, and had only resumed taking her medications on the same date Brune authored his opinion. Brune's opinion regarding Russell's limitations is far more restrictive than any other medical evidence in the record. Accordingly, the Court finds that the ALJ appropriately afforded little weight to Brune's opinion.

### II.  Materiality of Drug Dependence

Russell next assigns error to the ALJ's statement that "[t]here is no evidence that [Russell] is sober of cocaine and cannabis (as she reports to Dan Bruce, APRN)." (Filing No. 21 at p. 8). The Court agrees with Russell that the ALJ's statement that there is "no evidence" that Russell was sober

of cocaine is factually erroneous based on substantial evidence in the record. Russell's medical records and her testimony consistently reflect that she had not used cocaine since mid-2013. Russell reported to APRN Brune in July 2015 that she had been "clean" from cocaine for two years, and the urine sample taken from Russell in July 2015 tested negative for cocaine. Dr. Cottam, whose opinion the ALJ gave "greater weight" to, reviewed the record for the state agency in 2014, and concluded substance abuse was not problematic at the time, as Russell had been sober from crack cocaine for about one year.

Nevertheless, the Eighth Circuit utilizes the doctrine of harmless error in Social Security cases. See, e.g., *Byes v. Astrue*, 687 F.3d 913, 917-18 (8th Cir. 2012). To show an error was not harmless, Russell must provide "some indication that the ALJ would have decided differently if the error had not occurred." *Id.* at 917 (citing *Van Vickle v. Astrue*, 539 F.3d 825, 830 (8th Cir. 2008).

The ALJ's comment regarding Russell's sobriety from cocaine was made in the context of evaluating Russell's credibility. (Tr. 24). With respect to factual errors made by an ALJ in evaluating a claimant's credibility, "this Court will reverse if the record does not weigh so heavily against the claimant's credibility that the ALJ would have necessarily disbelieved the claimant absent the errors drawn from the record," and "reversal is warranted only where the remainder of the record does not support an ALJ's credibility determination." *Chaney v. Colvin*, 812 F.3d 672, 677 (8th Cir. 2016)(internal citation omitted).

The ALJ found Russell's statements concerning the intensity, persistence and limiting effects of her symptoms not entirely credible. In making this credibility determination, the ALJ cited several factors besides the mistaken statement that Russell was not sober from cocaine, including gaps in treatment, going on and off medication, vagueness in dates and whether she had refilled medications, and the timing of her seeking treatment in relation to the benefits proceedings. (Tr. 24-25). Moreover, although Russell's July 2015 urine test was negative for cocaine, it was positive for cannaboids, which generally undermines Russell's credibility with respect to her sobriety. The Court cannot say that, based on the evidence in the record, the ALJ would have decided the credibility issue differently, and substantial evidence in the record supports the ALJ's finding that Russell was less than credible.

### III. Fully and Fairly Developed Record

Finally, Russell argues the ALJ failed to fairly and fully develop the record by dismissing the opinions of those most qualified to render an informed opinion on Russell's mental RFC, and failed to accurately state the status of Russell's sobriety and history of drug abuse. (Filing No. 21 at p. 10).

An ALJ does have "a duty to fully and fairly develop the evidentiary record." *Byes v. Astrue*, 687 F.3d 913, 915-16 (8th Cir. 2012). In order to determine whether the ALJ fulfilled his or her duty to fully and fairly to develop the record, this Court must consider whether the record contained sufficient evidence for the ALJ to make an informed decision. See *Payton v. Shalala*, 25 F.3d 684, 686-87 (8th Cir. 1994). The claimant "bears a heavy burden in showing the record has been inadequately developed," and "must show both a failure to develop necessary evidence and unfairness or prejudice from that failure." *Combs v. Astrue*, 243 Fed. Appx. 200, 204 (8th Cir. 2007) (citing *Haley v. Massanari*, 258 F.3d 742, 749-750 (8th Cir. 2001)).

Russell specifically emphasizes the ALJ's mischaracterization of evidence regarding her sobriety from cocaine and argues that the ALJ should have therefore developed the record with respect to her substance abuse. However, as discussed above, the ALJ's statement regarding Russell's sobriety from cocaine only pertained to the ALJ's credibility determination regarding Russell. The ALJ did not indicate, nor does the record support, any finding that Russell's history of substance abuse prevented her from working, and Russell did not claim disability as a result of substance abuse. Therefore, the ALJ was not required to develop the record on this issue.

The record before the ALJ contained sufficient medical evidence for the ALJ to have made an informed decision regarding the formulation of Russell's mental RFC. When assessing a claimant's RFC, the ALJ must consider all relevant evidence in the record. See *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007). An ALJ may rely on state agency reviewing psychological consultants. See 20 C.F.R. § 404.1527(e); 20 C.F.R. § 404.1513a; *Musical v. Astrue*, 347 Fed. Appx. 260, 262 (8th Cir. 2009) (approving the ALJ's assessment of significant weight to a non-examining state agency medical consultant absent conflicting evidence from treating physicians). The record also contains Russell's treatment notes and opinion evidence from treating sources and non-treating sources regarding Russell's restrictions and mental limitations. In reviewing the record as a whole, the Court concludes the record contained sufficient medical

evidence upon which the ALJ could make an informed decision in formulating Russell's mental RFC, and therefore the ALJ was not required to develop the evidentiary record further.

## CONCLUSION

For the reasons stated above, and after careful consideration of each argument presented in Russell's brief, the Court finds that the Commissioner's decision is supported by substantial evidence on the record as a whole and is not contrary to law.   Accordingly,

**IT IS ORDERED:**

1.    Defendant's Motion to Affirm Commissioner's Decision (Filing No. 22) is granted;

2.    Plaintiff Laura Lee Russell's Motion for Order Reversing Commissioner's Decision (Filing No. 20) is denied; and

3.    A separate judgment will be entered.


Dated this 27th day of February, 2018.


BY THE COURT:


s/ Michael D. Nelson
United States Magistrate Judge